In re S.G.,

In re S.U.,

In re B.M.T.,

In re J.W.C., Appellants.

Nos. 93–FS–384, 94–FS–148, 94–FS–150 and 94–FS–155.

District of Columbia Court of Appeals.

Argued June 6, 1995.
Decided Aug. 17, 1995.

---

James A. Shrybman, with whom Meryl B. Rosenberg, was on the brief, for appellants.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the Office of Corporation Counsel, amicus curiae.

Before WAGNER, Chief Judge, and TERRY and KING, Associate Judges.

KING, Associate Judge:

These appeals involve petitions for adoption filed by the wives of the natural fathers of children born to surrogate mothers who were artificially inseminated by the sperm of the natural father. As far as the record shows, none of the wives seeking to adopt, their husbands, or the surrogate mothers are, or ever have been, residents of the District of Columbia. In each case the petitioners contend that, because the prospective adoptees were in the legal care, custody, or control of a District of Columbia child-placing agency, the trial court had jurisdiction to grant the adoption petitions pursuant to D.C.Code § 16–301(b) (1989 Repl.). We hold that under the circumstances presented, none of the children were ever in the "legal care, custody, or control" of the agency and, accordingly, the Superior Court did not have jurisdiction to hear the petitions.

**I.**

The jurisdictional statute applicable to these cases provides:

(b) Jurisdiction shall be conferred when any of the following circumstances exist:

(1) petitioner is a legal resident of the District of Columbia;

(2) petitioner has actually resided in the District for at least one year next preceding the filing of the petition; or

(3) *the child* to be adopted *is in the legal care, custody, or control of* the Commissioner [Mayor] or *a child-placing agency licensed* under the laws of the District.

D.C.Code § 16–301(b) (emphasis added). Only the third clause could apply in these cases because none of the petitioners are legal residents of the District of Columbia or actually resided in the District for one year before the filing of the petitions.

The facts are neither complicated nor in dispute. In each case a child was born pursuant to a surrogate contract, pursuant to which the natural mother agreed to be impregnated with the sperm of the natural father. Shortly after birth, the children were placed in the custody of the natural fathers and their wives who are the adoption petitioners.

None of the parties in the adoptions has had ties with the District in the past, and there is no indication that any link will be forged in the future. The only nexus with the District is the foreign parents' *pro forma* use of adoption agencies licensed in the District of Columbia.

In each case, the natural mother is a citizen of a foreign state or country, as are the father and his wife, the adopting parent. The child has never been a resident of the District. In *S.U.*, the child was born in Michigan, and the father and wife are both residents of Israel. In *B.M.T.*, the baby was born in New York to a New York resident, while the father and his wife are residents of Ontario, Canada. In *J.W.C.*, the baby was born in Indiana to a woman who is a resident of Indiana; however, the father and wife are New Jersey residents. Finally, in *S.G.*, the child was born in Detroit to a Michigan resident—the father and his wife are residents of Ontario, Canada. Each baby was placed in the custody of the natural father and his wife within a week of birth.

The natural mother of each child relinquished her parental rights in accordance

with surrogacy contracts that are not in the appellate record. It is undisputed, however, that the mothers agreed to bear the children, conceived by sperm donated by the fathers, and to relinquish their rights so that the children could live with the fathers and be adopted by their wives. In each instance, the mother's relinquishment of parental rights was to an adoption agency licensed to do business in the District, *i.e.,* Washington Family Services Associates or Children's Adoption Resource Exchange ("C.A.R.E.").

Proceedings were commenced in each case by a petition to adopt, filed by the wife of the natural father, together with the father's consent to that adoption and no other. In three of the cases, the father expressly reserved all parental rights: "That, while I consent to this adoption by the Petitioner, my wife, I expressly retain all my parental rights as the natural father of the child sought to be adopted in these proceedings." The father in *S.G.* simply consented to the adoption and name change. Finally, in none of the cases is there any contention that the adoption agency ever had physical custody of the children or exercised discretion about their placement or care.

In *S.G.,* Judge Winfield dismissed the petition on the grounds that the parties had no relationship to the District, and because surrogate contracts are contrary to the District's public policy. In the three remaining cases, Judge Alprin dismissed the petitions, ruling, in a twenty-two page memorandum opinion, that the court did not have jurisdiction because the adoption agencies never had legal care, custody, or control over the adoptee as required by the statute conferring jurisdictions upon the court for adoptions. *See In re J.W.C., et al.,* D.C.Super.Ct., 122 D.W.L.R. 249 (Feb. 9, 1994) (Alprin, J.); *see also,* D.C.Code § 16–301(b)(3). These appeals followed. The cases were consolidated

for all purposes, and the Office of the Corporation Counsel was requested to appear as *amicus curiae.*

## II.

The prospective adopters can invoke the jurisdiction of the Superior Court only if the adoptee has been placed into the legal care, custody, or control of an adoption agency ("agency") licensed in the District pursuant to § 16–301(b). Petitioners contend that the requisite placement with the agency was accomplished by the relinquishment of parental rights by the natural mothers to the agency and the consent of the natural fathers to the petition for adoption by their wives. We reject that contention for the reasons set forth in Judge Alprin's opinion in the trial court.

The "Analysis" portion of Judge Alprin's opinion is set forth as Part III, and is hereby incorporated, in edited form,[1] as the opinion of this court.

## III.

### Analysis

The adoption process requires that the rights of the natural parents be determined in some constitutionally legitimate fashion. In this jurisdiction, such rights may be surrendered voluntarily in one of two ways. The parent may execute "a written statement of consent" to the adoption of the child by another person pursuant to D.C.Code § 16–304(a) [ (1989 Repl.) ], or the parent may execute a relinquishment of parental rights, as provided in D.C.Code § 32–1007(a)(1) [ (1993 Repl.) ]. "In the first case, the prospective adopting parents commonly have been identified by the time the natural parents' 'consent to adoption' is executed. . . .

---

1. Judge Alprin's opinion applied to eight separate adoptions, three of which are before us in these appeals (Nos. 94–FM–148, 94–FM–150, and 94–FM–155). The "Analysis" portion of his opinion has been edited to eliminate reference to the five cases not part of these appeals. There has also been some minor editing. In addition, some footnotes have been shortened, footnote 6 in its entirety has been inserted by this court, one footnote relating to an adoption not part of this

appeal was deleted, and the remaining footnotes have been re-numbered to conform to the numbering in this opinion. Finally, footnote 8 and all references to *S.G.* were added by this court. Material added by this court is contained in brackets, and deletions are indicated by ellipses.

Judge Alprin's opinion in its entirety can be found in the Washington Daily Law Reporter. *See In re J.W.C.,* D.C.Super.Ct., 122 D.W.L.R. 249 (Feb. 9, 1994) (Alprin, J.).

In the latter case, however, adopting parents may or may not yet be available; the natural parent surrenders the child to the agency, executing a 'relinquishment of parental rights' which, in effect, grants the agency license to consent to eventual adoption." *J.M.A.L. v. Lutheran Social Servs., Inc.*, 418 A.2d 133, 134–35 (D.C.1980).

The major difference between the two procedures for purposes of the instant cases is that a properly executed relinquishment to a child-placing agency may provide a jurisdictional underpinning to the filing of an eventual adoption petition pursuant to § 16–301(b)(3), because it severs the parental rights and responsibilities of the parent executing the relinquishment.[2] In instances where the other parent is absent or fails to assert his parental rights to the child, ... or where both parents execute relinquishments, parental rights and responsibilities are transferred to the agency for purposes of placement in an adoptive home and eventual consent by the agency to an adoption. The transfer of all parental rights and responsibilities with respect to a child to an agency is tantamount to placing with that agency "the legal care, custody, or control" [3] of the child pursuant to § 16–301(b)(3). Thus, the jurisdictional prerequisite is satisfied when an adoption petition is filed by petitioners who cannot meet the residency requirements of § 16–301(b)(1) or (2).

On the other hand, a written statement of consent by a parent pursuant to § 16–304(b) has no particular jurisdictional effect under § 16–301(b), because it typically provides for the parent's consent to a specific adoption by identified adopter(s), and does not transfer parental rights and responsibilities, or legal care, custody, or control of the child, to a licensed child-placing agency. If the prospective adopters change their mind, the natural parent's consent to the specific adoption is for naught, and he or she retains parental rights. Similarly, even if the specified adoption goes forward, the natural parent's rights with respect to the child remain intact until a final decree of adoption is granted. Where the consents of both natural parents are attached to an adoption petition and the child has not been relinquished to an agency, therefore, the petitioner(s) must meet the residency requirements specified in the statute.

In each of the ... cases now before the court, non-resident petitioners seek to invoke this court's jurisdiction in the only manner available to them, *i.e.*, by use of the natural mother's relinquishment of her parental rights and responsibilities to a licensed District of Columbia child-placing agency. In every case, the natural father has filed his consent to the adoption and has joined his wife's petition. In every case, the identity of the adopter was known to the natural mother at the time she relinquished her parental rights. In all cases [except *S.G.,*] the natural father specifically preserved his parental rights by filing a document to that effect at the time his wife filed the adoption petition.

None of these facts, of course, is surprising. All of these petitions result from surrogate parenting agreements, in which, it appears,[4] the surrogate natural mother agreed to be artificially inseminated with the sperm of the natural father, to carry the resulting child to term, and, upon birth, to turn the child over to the natural father. It appears also that the surrogate natural mother further agreed to consent to adoption of the child by the natural father's wife, by whatever legal formulation might be required to effectuate that consent. In some fashion it was determined ... that a relinquishment to a District of Columbia child-placing agency

---

**2.** A relinquishment is defined by the District of Columbia Municipal Regulations as:

> the legal document voluntarily executed by the natural parent(s) severing all of their parental rights and responsibilities to their child and transferring these rights and responsibilities to a child-placing agency for the purposes of placing the child in an adoptive home and consenting to adoption.

29 D.C.M.R. § 1645.1 (1990).

**3.** [Appellants] make much of the use of the disjunctive "or" in the statute, rather than the conjunctive "and." The court's view is that the distinction is irrelevant in the circumstances of these cases. [The meaning of each term used in the statute is discussed in n. 6 *infra* and accompanying text.]

**4.** The contracts themselves [were] not before the [trial] court [and are not before this court].

was the preferred method of consent, possibly, although not necessarily, because surrogate parenting arrangements are not looked upon with favor in ... [the foreign jurisdiction where the child was born or where the father and the petitioner currently reside.] [5]

Thus, the jurisdictional issue presented by these cases depends on a determination of the nature and effect of the documents executed by the natural mothers which purport to transfer their parental rights and, therefore, legal care, custody or control of the children to licensed child-placing agencies.

The court assumes, for purposes of this decision, that the documents in question may properly be characterized as "relinquishments," and that they effectively extinguish the natural mothers' parental rights. Even so, as indicated above, jurisdiction is not conferred solely by the execution of a valid relinquishment by one parent. Jurisdiction under § 16–301(b)(3) depends on "legal care, custody, or control" of the child having been transferred to the child-placing agency. While that term is not defined in the District's adoption statute, the term "legal custody" is defined elsewhere in Title 16 of the D.C.Code, specifically in that chapter of Title 16 dealing with delinquency, neglect, and need of supervision proceedings. Under D.C.Code § 16–2301(21) (1989 Repl.):

'legal custody' ... vests in a custodian the responsibility for custody of a minor child which includes—

(A) physical custody and the determination of where and with whom the minor shall live;

(B) the right and duty to protect, train, and discipline the minor; and

(C) the responsibility to provide the minor with food, shelter, education, and ordinary medical care.

The term "legal custody" [6] refers "to the entire bundle of parental rights and responsibilities." [In re ] L.E.J., 465 A.2d 374, 378 (D.C.1983).[7] While the breadth of this definition may exceed that normally understood as applying in the adoption context—physical custody is almost always delegated by an agency to a prospective adopter—it provides a basis for analyzing the nature of the legal relationship between the child-placing agencies and the proposed adoptees following the natural mothers' relinquishment in these cases.

Here, in all [four] cases, far less than the "entire bundle of parental rights and respon-

5. Surrogate parenting contracts are "void and unenforceable" by statute in Michigan, MICH. COMP.LAW ANN. § 25.248(155) (West 1988), and New York, N.Y.DOM.REL.LAW § 122 (Consol.1992). They are not favored in New Jersey, see [In re] Baby M., ... 109 N.J. 396, 537 A.2d 1227 (1988). They are not specifically prohibited under Israeli law, as of November 1992, but their status is unclear. Letter from Ruth Levush, Senior Legal Specialist, Law Library of the Library of Congress, to [Judge Alprin,] November 19, 1992....

Their status in Ontario is not yet determined, but the Royal Commission on New Reproductive Technologies has recently recommended that surrogate parenting contracts be made unlawful, on the ground that "potential benefits to a few individuals are far outweighed by the harms to others and to society," and that they "have the potential to exploit women's vulnerability because of race, poverty, or powerlessness and leave women open to coercion." The report recommends federal regulation prohibiting surrogacy arrangements, and regulating other reproductive technology. Royal Comm'n on New Reproductive Technologies Update, December 1993, p. 14....

Parenthetically, surrogate parenting contracts are illegal in the District of Columbia as of March 17, 1993, D.C. Law 9–219; D.C.Code

§ 16–401–02 (1993 Supp.), but since the filing of all ... [of the] petitions pre-dated [the enactment], this recent expression of District of Columbia policy has played no part in this decision, which is based entirely on jurisdictional considerations....

6. [The jurisdiction provision speaks to "legal care, custody or control" while § 16–2301(21) defines only legal custody. We see no difference, in the meaning of the terms, in the context present here. "Care" is defined as "responsibility for or attention to safety and well being"; and "control" means "the power to guide or manage." WEBSTER'S NEW INTERNATIONAL DICTIONARY (1981).]

7. Quoting with approval Burge v. City and County of San Francisco, 41 Cal.2d 608, 262 P.2d 6, 12 (1953) and other cases. [This court,] in L.E.J., also described the concept of custody as embracing "the sum of parental rights with respect to rearing a child, including its care." 465 A.2d at 378. Accord, e.g., Drummond v. Fulton County Dep't [of Family and Children Servs.,] 237 Ga. 449, 228 S.E.2d 839 (1976), [cert. denied, 432 U.S. 905, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977) ]; State v. Britzke, 108 Wis.2d 675, 324 N.W.2d 289 (1982).

sibilities" was transferred to the agencies. Indeed, significantly less than is normally transferred in a standard relinquishment situation was turned over. In each case, [except *S.G.,*] at about the time the relinquishments were executed, the adoption petitions were filed, accompanied by a document entitled "Joinder and Consent of Natural Father." Paragraph five of that document in all [three] cases is worded identically:

> That, while I consent to this adoption by the Petitioner, my wife, I expressly retain all my parental rights as the natural father of the child sought to be adopted in these proceedings.

Certainly, none of the natural fathers, in light of this express reservation, would agree that "permanent care and guardianship" of his child, in the language of the relinquishment statute, had been transferred to the agency, much less than the entire bundle of parental rights he had expressly reserved.[8]

Furthermore, [at least one of] the "relinquishments" ... qualif[ies] the extent of what is being transferred to the agency. [For] example[ ], [that] surrogate mother[ ] specifically restrict[ed] the agency's authority to place the child with anyone other than petitioner and her husband, the natural father.[9] ...

Th[is] example [is] illustrative of what was the unmistakable intention of all the participants in these cases. In each case, a surrogate parenting contract was entered into by the natural mother and the petitioner and her husband. Under its terms, the surrogate natural mother was artificially inseminated with the sperm of the natural father. The surrogate mother carried the resulting child

to term, agreed to its adoption by the petitioner, the natural father's wife, and signed whatever documents were determined to be necessary to effect her formal consent and facilitate the adoption. For whatever reason,[10] it was decided that adoption should be sought in the District of Columbia. As all petitioners are non-residents, jurisdiction of the District of Columbia Superior Court would require that the child be "in the legal care, custody, or control" of a licensed child-placing agency. Accordingly, a relinquishment would be necessary to transfer to the agency such legal care, custody, or control, as standard consents would be insufficient for that purpose. And so, in accordance with her agreement, each natural mother signed a standard relinquishment form, [at least one] of which [was] altered in certain respects as indicated above.

 It [was] clear to [the trial] court beyond doubt that none of the natural mothers or any participant in these cases intended that "permanent care and guardianship" of the child, as used in D.C.Code § 32–1007(a)(1), would be transferred to the agency, enabling the agency to consent to any adoption except the one which had been agreed upon. [In all but one of the cases,] [t]he natural fathers expressly stated contrary intentions, and, without question, would have contested any other adoption to which the agency might have consented. [Although not expressly stated, the father in the remaining case (*S.G.*) has made it clear that he has not transferred any right to exercise "permanent care or guardianship" to the agency.] What was agreed to and what was intended was either a simple consent by the natural mother to a specific, identified adop-

---

**8.** [In *S.G.*, the father simply consented to the adoption and name change, but did not expressly retain all parental rights. In that case, however, the child has been in the physical custody of the natural father since shortly after birth, and the father does not contend that he has ever surrendered "care, custody or control" to the agency or any other person or entity.]

**9.** The relinquishment in [that] case provides:

> I want to give up all my parental rights to C.A.R.E., *so that C.A.R.E. can place my child for adoption with the family identified by me* and approved for adoption by C.A.R.E. (emphasis in original). ...

Elsewhere, the relinquishment states:
> I have decided to place the child with C.A.R.E., for them to place the child with the adoptive couple I have identified, for the purpose and privilege of adopting the child. ...

**10.** The status of surrogate contracts in petitioners' home jurisdictions may have played only a partial role in the decision to seek adoption in the District of Columbia. Our perceived liberal adoption laws and procedures may have been another important consideration. *See [In re] G.B., J.M.,* 121 D.W.L.R. 665, 668 n. 4, D.C.Super.Ct., Feb. 22, 1993 (Winfield, J.).

tion, or, possibly, a partial relinquishment that would operate in the same fashion as a standard consent. That being the case, legal care, custody or control of the proposed adoptees was never intended to, and did not, [pass] to the child-placing agencies, whatever the title of the form executed by the natural mothers.

## IV.

██ Accordingly, because there is no basis for the assertion of jurisdiction by the Superior Court under § 16–301(b), the orders dismissing each[11] of the petitions must be

*Affirmed.*

---

11. Although the petition in No. 93–FS–384 was dismissed on other grounds, it is well settled that we may affirm on grounds not raised or considered in the trial court. *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C.1993). Moreover, a jurisdictional defect, such as that present here, may be noticed at any time. *Gilles v. Ware,* 615 A.2d 533, 554 (D.C.1992) (Reilly, J., concurring) (citing *Langley v. District of Columbia,* 277 A.2d 101 (D.C.1971)).