### In re A.W.K.

**An. K., Appellant.**

**Nos. 97–FS–1771, 98–FS–1572.**

District of Columbia Court of Appeals.

Argued Jan. 11, 2000.
Decided Aug. 2, 2001.
As Amended Aug. 22, 2001.

Leslie J. Susskind, appointed by this court, for appellant An.K.

Lawrence M. Spillan, Washington, DC, guardian ad litem for A.W.K., filed a statement in lieu of brief.

James A. Shrybman, Silver Spring, MD, appointed by this court, for appellees J.E.S. and M.B.S.

Sheila Kaplan, Assistant Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.

Before WAGNER, Chief Judge, REID, Associate Judge, and BELSON, Senior Judge.

BELSON, Senior Judge:

These consolidated adoption and neglect cases raise several issues concerning the proceedings held to determine the status of the minor, A.W.K. (1) Did the trial court have jurisdiction over the adoption petition on the basis of the general equitable powers of the court or the role assumed by the Department of Human Services ("DHS") over the care, custody, or control of A.W.K. pursuant to orders of the trial court, even in the absence of a specific order committing A.W.K. to the custody of DHS? (2) Did the court proceed permissibly in bifurcating the adoption proceeding by conducting first a show cause hearing limited to determining whether the birth parents were withholding their consent to A.W.K.'s adoption contrary to the child's best interests, and further limiting that hearing to determining the fitness of the birth parents, without concurrent consideration of the suitability of the petitioners in the adoption proceeding? (3) In conducting such a limited show cause hearing, did the adoption judge abuse his discretion by refusing to direct petitioners to answer certain interrogatories about their backgrounds and financial status on the ground that they went beyond the scope of the show cause hearing? (4) Was there clear and convincing evidence to support the

adoption judge's decision that the birth parents were withholding their consent to adoption contrary to A.W.K.'s best interests? (5) Did the neglect judge abuse her discretion in suspending visitation by the then-incarcerated birth parents after the adoption judge ruled that they were unreasonably withholding their consents? We conclude that there is no basis for reversal, and affirm the rulings of the trial court.

## I.

A.W.K. was born addicted to cocaine on February 3, 1995, at D.C. General Hospital, to appellant An.K., who was on temporary release from incarceration for the birth. Subsequently, An.K. was returned to D.C. jail and released a few days later. On February 27, 1995, she was again arrested and incarcerated, this time on a charge of robbery of a senior citizen, for which she eventually received a sentence of from four to fifteen years. Even though appellant was released from jail for a brief time after the birth, she did not visit her child in the hospital. On February 28, 1995, A.W.K. was ready to be released from the hospital but appellant failed to make any arrangements for her child's care. The hospital therefore contacted DHS which in turn contacted the Office of Corporation Counsel and signed a petition for neglect in the Family Division of the Superior Court.

Shortly after the filing of the neglect petition, the court placed A.W.K. in the care of his maternal grandfather, Mr. DeB. After a few days, Mr. DeB. proved no longer able to care for the child, so he placed him with A.B., a young woman who was a family friend. The neglect court approved this arrangement and conditionally released A.W.K. to A.B. In accordance

with a placement order issued in the neglect proceeding, A.B. was permitted to take the child to New York to visit A.B.'s parents, M.B. and J.E. Smith,[1] on weekends. A.B. had contacted her parents because she knew they were interested in adopting a child. At the same time the court ordered DHS to supervise and coordinate visits by A.W.K. with An.K. and W.D., A.W.K.'s biological father, both of whom were incarcerated. A social worker from DHS conducted all visits, and maintained frequent contact with the birth parents. DHS had the authority to modify the duration of any visitation based on the child's needs.

At the time of A.W.K.'s conception, An.K. was using cocaine and heroin, but she began to substitute methadone for heroin when she learned of her pregnancy. An.K. has an extensive history of drug abuse and crime, including eleven convictions of sexual solicitation, solicitation for lewd and immoral purposes and indecent acts, six convictions of misdemeanor Bail Reform Act violations, and one conviction of robbery of a senior citizen. An.K. had given birth to four other children since she was sixteen, but had failed to parent any of them effectively for a significant period of time. At the time of the proceedings, she did not know the whereabouts of two of her children. While incarcerated, An.K. took some positive steps to improve herself, successfully completing a communication and conflict resolution program and a parenting and literacy skills program offered by the D.C. Department of Corrections, and obtaining a general equivalency diploma. During An.K.'s pregnancy, W.D. demonstrated little concern for An.K. or their unborn child, and it was not until late 1995 or early 1996 when DHS met with

---

1. We substitute "Smith" for the actual surname of petitioners for adoption, M.B.S. and J.E.S.

W.D. to discuss a paternity test that he showed any interest in the child. Like An.K., W.D. was deeply involved in crime, having spent more than twenty-five years of his life in prison.

On September 26, 1995, An.K. stipulated that she was unable to care for the child due to her incarceration and prior drug abuse problem, and the court found A.W.K. neglected. Subsequently, on November 7, 1995, DHS submitted a report to the neglect court, making a recommendation as to A.W.K.'s care and placement. At a disposition hearing on December 12, 1995, all parties, including the birth parents, Mr. and Mrs. Smith, the guardian *ad litem* for A.W.K., and A.B. were present. The court ordered that A.B. have custody of the child and made provision for regular visitations to Mr. and Mrs. Smith in New York. DHS was ordered to arrange for a report to the court concerning the condition of the Smith home as foster placement for the child pending an investigation DHS was to arrange with the New York State Interstate Compact on the Placement of Children ("ICPC"). Before A.W.K. could reside with the Smiths as a foster child, approval had to be obtained from the New York ICPC office.

In the early part of May 1995, when A.W.K. was three months old, Mrs. Smith had moved to Maryland to live with her daughter, A.B., on a full time basis in order to care for A.W.K. while waiting for the ICPC process to be completed. Mrs. Smith's presence was necessary because A.B. worked during the day time and was not home to care for the child. Mr. Smith remained in New York because he had to work, but each weekend he traveled to Maryland to be with his wife and A.W.K. The New York Human Resources Admin-

istration's ICPC approval was obtained and in its order upon intermediate review on February 6, 1996, the court transferred A.W.K. to private placement with the Smiths in New York. A.W.K. has resided with the Smiths since that date. From that time until October of 1997, the Smiths cooperated in bringing A.W.K. to the Washington area for visits with his incarcerated parents.

Shortly after the court found A.W.K. neglected, on November 17, 1995, the Smiths filed a petition to adopt A.W.K. It alleged that the Superior Court had jurisdiction under D.C.Code § 16–301(b)(3) (1997) as the child was under the legal care, custody, or control of DHS. The adoption proceedings went forward concurrently with the neglect proceedings. The two matters were consolidated only for the purpose of providing An.K. and W.D. with appointed counsel for the adoption matter as well as the neglect matter. Judge Burnett held a show cause hearing in the adoption matter in September 1997, to determine whether the biological parents' consent to the adoption was being withheld contrary to the best interests of the child. On October 1, 1997, Judge Burnett issued an oral order waiving the biological parents' respective consents to the adoption, finding that they were withholding consent contrary to the best interests of A.W.K. On October 5, 1997, Judge Beck, aware of Judge Burnett's ruling, suspended all visitation rights of the biological parents in the neglect proceeding. Subsequently Judge Burnett entered an interlocutory decree of adoption, which was followed by a final decree. Both birth parents submitted timely notices of appeal.[2]

---

**2.** The biological father, W.D., filed timely notices of appeal in both the adoption and the neglect proceedings. He filed no brief on

appeal. Corporation Counsel informed the court in its brief that W.D. is now deceased. His appeals have been dismissed. The guard-

## II.

For the first time on appeal, appellant An.K. argues that the Superior Court lacked jurisdiction over the adoption proceeding. D.C.Code § 16–301(b) provides:

[J]urisdiction [to hear and determine petitions and decrees of adoption] shall be conferred when any of the following circumstances exist:

(1) petitioner is a legal resident of the District of Columbia;

(2) petitioner has actually resided in the District for at least one year next preceding the filing of the petition; or

(3) the child to be adopted is in the legal care, custody, or control of the Mayor or a child-placing agency licensed under the laws of the District.

Petitioners do not meet the residence requirements, and therefore the only possible statutory basis for jurisdiction was that A.W.K. was "in the legal care, custody, control of the Mayor or a child-placing agency licensed under the laws of the District." [3] Both the District of Columbia and appellee petitioners for adoption argue that the court had jurisdiction over the adoption proceeding, but they offer entirely different arguments in support of that conclusion.

The District would acknowledge that "the technical jurisdictional requirement[s] of § 16–301(b) were not met here," but argues that the Superior Court derived jurisdiction from its general equitable powers. The District states that DHS "never had actual legal custody" of A.W.K. It argues that it would be senseless for the

District of Columbia to deny a forum to the adoptive petitioners here after the Superior Court has adjudicated A.W.K. neglected, directly supervised his care, and even placed him with the individuals who sought to adopt him.

The District attempts to identify other comparable situations in which we have found jurisdiction to exist, but points to no situation in which the requirements for the jurisdiction of the Superior Court were specified by an applicable statute such as § 16–301(b). In *Felder v. Allsopp*, 391 A.2d 243 (D.C.1978), which the District cites, we held that an action for visitation rights by one who claimed to be the father of the child could be brought under the equitable powers of the Superior Court despite the fact that "proceedings ... to establish parentage" brought pursuant to D.C.Code § 16–2342 (1973) were governed by a two-year statute of limitations which the father could not meet. The statutory limitation in question, however, did not by its terms apply to actions for visitation. Similarly, in *In re D.M.*, 562 A.2d 618 (D.C.1989), also cited by the District, the trial court was held to have equitable jurisdiction to consider paternity independent of a request for child support. Finding that neither custody, divorce nor child support was sought by petitioner, the court looked to its general equity powers as the basis for jurisdiction over the matter. More recently, in *Ysla v. Lopez*, 684 A.2d 775 (D.C.1996), this court held that the Superior Court's power to adjudicate custody disputes between unmarried parents

---

ian *ad litem* for A.W.K. filed neither a notice of appeal nor a brief.

**3.** According to the Superior Court Rules Governing Adoption Proceedings, (adopted during the pendency of this case in Superior Court), Mayor is defined as "the Mayor of the District of Columbia or the District of Columbia Department of Human Services (DHS) or

a successor public child welfare agency." Super. Ct. Adopt. R. 2 (1997). The comment to Rule 2 furthers defines Mayor to include "the United States District Court-appointed receivership of the Department of Human Services in effect at the time of the promulgation of these rules." *Id.*

stemmed from its general equitable powers even though the statutes that dealt expressly with temporary or permanent custody referred only to married persons. We remarked there that the legislature had not sought to limit the court's inherent authority in that area.

The proffered comparisons do little to advance the District's argument. The assertedly analogous statutes were not, like § 16–301, fashioned for the purpose of establishing the bases upon which jurisdiction is conferred over an entire subject matter.

While the other parties have made no comment on the District's argument of inherent or general equitable authority, our own review of relevant authorities from other jurisdictions discloses that the judicial power to effect an adoption is generally viewed as purely a creature of statute. In *Saint Vincent's Infant Asylum v. Central Wis. Trust Co.*, 189 Wis. 483, 206 N.W. 921 (1926), the Supreme Court of Wisconsin declared: "Equity has no power to declare an adoption. The common law was and is a stranger to adoption proceedings. So, before we can declare that an adoption has taken place, we must consider what has been done and check it up with the statutory requirements." *Id.* at 922. *See Rivers v. Rivers*, 240 Ala. 648,

200 So. 764, 766–67 (1941); *In re McDonald*, 43 Cal.2d 447, 274 P.2d 860, 862 (1954); *Lien v. Gertz*, 158 Colo. 416, 407 P.2d 328, 329 (1965); *Lyman v. Sullivan*, 147 Conn. 134, 157 A.2d 759, 760 (1960); *In re Adoption of McCauley*, 177 Neb. 759, 131 N.W.2d 174, 180 (1964); *Appeal of Ritchie*, 155 Neb. 824, 53 N.W.2d 753, 755 (1952); *Borner v. Larson*, 70 N.D. 313, 293 N.W. 836, 839 (1940); *In re Adoption of Francis*, 82 Ohio App. 193, 77 N.E.2d 289 (1947).[4] Even where adoption proceedings are treated as matters in equity, jurisdiction over them is usually conferred specifically by statute. *See, e.g., Houston v. Brackett*, 38 Ill.App.2d 463, 187 N.E.2d 545, 548 (1963); *In re Lynn M.*, 312 Md. 461, 540 A.2d 799, 800, 802 (1988).

Most significant is the observation of the Court of Appeals of Maryland that the jurisprudence of that state—the source of the common law of the District of Columbia—recognizes no general equitable power over adoption matters.[5] "While the right of adoption was known to the ancients of Greece and Rome and many other nations, it was unknown to the common law of England, and exists in this country in those jurisdictions having that law as the basis of their jurisprudence, only as the result of statutes." *Winter v. Director of Dep't of Pub. Welfare*, 217 Md. 391, 143

---

4. *See also* 2 C.J.S. ADOPTION OF PERSONS § 73 (1972) (citing cases) ("[W]here essential statutory requirements have not been met, equity cannot decree an adoption on the ground that it has power to decree that that be done which in equity and good conscience ought to have been done.").

5. After the District of Columbia was created and became a federal district in 1800, Congress provided that the statutes and common law of the State of Maryland as they existed in 1801, including English statutes and common law in effect as of 1776, were adopted for the District of Columbia. (2 Stat. L. 103, ch. 15, § 2 (Feb. 27, 1801), and 31 Stat. L. 1189 (March 3, 1901)). Laws in force in the Coun-

ty of Washington, District of Columbia, which was that portion received from Maryland, included the principles and maxims of equity as they existed in England and in the colony in the year 1776. *See* D.C.Code, Vol. 1 "History of the D.C.Code" (1991 Repl.). *See also Williams v. United States*, 569 A.2d 97, 99–100 (D.C.1989) (this court bound by Maryland common law in effect as of 1801, subject to court's inherent power to alter or amend common law); *O'Connor v. United States*, 399 A.2d 21, 25 (D.C.1979) (all common law in force in Maryland at time of cession of the District of Columbia remains part of D.C. law today unless repealed or modified by statute).

A.2d 81, 83 (1958). By statute, Maryland has provided "that an equity court has jurisdiction over adoption" proceedings. *In re Lynn M., supra,* 540 A.2d at 801 (considering statutory provisions now codified at MD.CODE ANN. FAMILY LAW § 1–201(a)(1) (1984)). In Maryland, the Circuit Courts serve as equity courts. *Id.* at 802. Considering the generally-held view that adoption proceedings are purely the creatures of statute, and giving special weight to the Maryland authorities to that effect, we are unpersuaded by the District's argument that the Superior Court had jurisdiction over the proceedings in this case on the basis of its general equitable powers.

■ Unlike the District, the adoptive parents argue that the Superior Court did have jurisdiction under § 16–301, and that the absence of a formal order committing the child to DHS (and thus to the mayor under § 16–301(b)(3)) was a technical omission. They alleged in their complaint that the Superior Court had jurisdiction "as the child is under the legal care, custody or control" of DHS. They argue that the neglect and adoption records demonstrate that DHS was in fact vested with legal care, custody, or control over the respondent, and the absence of a formal order should not defeat the best interests of the child.

Observing that this court should look to substance rather than form, appellees contend that DHS acted with respect to the adoptee essentially as it does with respect to a child committed to it for planning and placement. Appellees point to numerous indications that DHS had care, custody, or control of the adoptee. The records of the neglect and adoption cases show the following: when the infant A.W.K. was initially placed in the care of his maternal grandfather, Mr. DeB., DHS counter-

signed Mr. DeB.'s acknowledgment of the warning that his failure to comply with the court's order might result in the child's removal from his care; DHS played the same role when the child was conditionally released to the care of A.B.; visitation of the child with his mother was to be supervised by DHS and coordinated through DHS; the neglect court forbade An.K. or anyone on her behalf to contact the caregiver except through DHS; an Interstate Compact Placement Request form signed by a DHS official on June 19, 1995, and sent by DHS to New York authorities to obtain information regarding placement with, and potential adoption by, the Smiths indicated that DHS was the agency responsible for the child both financially and with respect to planning; DHS filed a comprehensive disposition report with the neglect court dated November 7, 1995, making detailed recommendations regarding the care and placement of the child; the neglect court scheduled reviews every six months, as required by § 16–2323(a)(2) for children committed to the custody of an agency, department, or institution, as contrasted with children committed otherwise for whom only annual reviews are required; on November 20, 1995, the adoption court entered an order of reference directing DHS to make a thorough investigation of the matters raised by the adoption petition; the New York counterpart of DHS sent a letter dated November 29, 1995, to the Interstate Compact Administration reciting that "it was agreed that [the] District of Columbia would retain legal custody and financial responsibility for the child during interstate placement" in New York; in a report and recommendation filed on April 8, 1996, pursuant to a court order in the adoption case, DHS, acting under the control of the Office of General Receivership ("OGR"),[6] recited

6. On May 22, 1995, United States District Judge Thomas F. Hogan placed the Child and

that the proceeding came within the jurisdiction of the Superior Court under D.C.Code § 16–301(b)(3) as the "child is in the legal custody of the Office of General Receivership"; the neglect court directed DHS to secure a report from Virginia DHS concerning possible placement with A.W.K.'s paternal aunt; the adoption court approved a request by DHS for an extension of time to complete that report to the court so that it could adequately assess potential placement with that paternal aunt; the adoption checklist generated by the Superior Court itself and updated two days before the court entered its Findings of Fact, Conclusions of Law and Memorandum Opinion on December 22, 1997, indicates that respondent was "in the legal custody of ... DHS/OGR"; and the adoption trial judge referred to A.W.K. as the ward of the city (and thus DHS), and at trial referred to the District of Columbia as the caretaker of the child.

Appellees argue that the numerous court orders to DHS in the neglect and adoption proceedings had the effect of giving DHS legal care, custody, or control, and that, in any event, DHS assumed that role in fact. They also emphasize that the statute is written in the alternative—"care, custody, *or* control"—and argue that DHS legally exercised some or all of those responsibilities.

We approach with circumspection the argument that jurisdiction exists under § 16–301(b)(3) despite the fact that the record contains no court order explicitly committing A.W.K. to DHS or a District of Columbia-licensed child placement agency. In order to rule on it, we are obliged to review the adoption and neglect records as a whole and determine whether under all the circumstances the child was under the

Family Services division of DHS under the control and supervision of a General Receiver. The Office of General Receivership was

legal care, custody, or control of DHS to a degree substantial enough to give the Superior Court jurisdiction over the petition to adopt him.

 Our holding in *In re S.G.*, 663 A.2d 1215 (D.C.1995), requires us to look to substance rather than form in determining whether the trial court has jurisdiction over adoption petitions. *S.G.* and its companion cases involved petitions for adoption filed by the wives of the natural fathers of children born to surrogate mothers. All of the persons involved were nonresidents of the District of Columbia. The only nexus between the adoptions and the District was the out-of-state parents' *pro forma* use of adoption agencies licensed in the District of Columbia. The surrogate mothers had executed forms relinquishing their parental rights to child-placing agencies located in the District. The natural fathers had consented to the petitions for adoption filed by their wives. This court affirmed the trial court's ruling that under the circumstances "legal care, custody or control of the proposed adoptees was never intended to, and did not, [pass] to the child-placing agencies, whatever the title of the form executed by the natural mothers." *Id.* at 1221.

Our case is virtually the converse of *S.G.* Here, the court in fact placed upon DHS substantial legal responsibilities for the care and control, if not the actual custody, of A.W.K. Once the neglect court found A.W.K. to be a neglected child, it had the several options for disposition set forth in § 16–2320(a). They included, among others, transferring legal custody of A.W.K. to a public agency responsible for the care of neglected children pursuant to § 16–

formed to improve the services provided by DHS to the children in its custody.

2320(a)(3)(A), or to a relative or other individual the Family Division found qualified, § 16–2320(a)(3)(C). In this case the Division entered no formal order of commitment, but chose the alternative disposition of placing the child first in the custody of A.B. (with whom Mrs. Smith was temporarily living in order to care for A.W.K.) and then of the Smiths, under § 16–2320(a)(1). Upon disposition, the Division had the authority under § 16–2320(a)(5) to order any public agency of the District such as DHS to provide any service for the benefit of the child that was within the agency's legal authority. In this case, the court ordered DHS, a public agency, to perform for A.W.K. the plethora of services described above.

In June of 1995, before the adoption petition was filed, the court placed DHS in control of the visits A.W.K. had with his biological parents. DHS was later given explicit authority to modify the duration of such visits. In that same month a DHS official signed a form addressed to the New York City Department of Social Services which stated that DHS was financially responsible for A.W.K., and responsible for planning for him as well. In November of 1995, shortly after the adoption petition was filed, a letter from the New York Human Resources Administration stated that it was agreed that the District of Columbia will retain legal custody and financial responsibility for the child during interstate placement. A report filed by DHS with the court in April of 1996 set forth that A.W.K. was in the legal custody of DHS/OGR (another report stated that A.W.K. was not a ward of OGR). An adoption checklist, generated by the court itself and updated two days before the adoption court issued its Findings of Fact, Conclusion of Law and Memorandum Opinion, stated that A.W.K. was in the custody of "DHS/OGR." [7]

▆▆▆ The fact that the issue of jurisdiction was not raised until appeal is itself indicative of the participants' sense of what the reality was.[8] It apparently never occurred to the judges involved in the neglect and adoption proceedings or to the several lawyers representing the various parties in the neglect and adoption proceedings to raise the question. Even more telling is the fact that if the matter had been raised in the trial court, the court in all likelihood would have quickly resolved it by formalizing the role of DHS in the care, custody, or control of A.W.K. *C.f. Petition of C.E.H.,* 391 A.2d 1370, 1374 (D.C.1978).

**7.** The Interlocutory Decree of Adoption recites that at all material times the adoptee "has been in the legal care, custody and control of the Superior Court ... but in the third-party placement and actual care, custody and control of the Petitioners under the supervision of the Superior Court in a related neglect case." This must be regarded as an incomplete statement regarding the Superior Court's role, as the court can exercise legal care, custody, or control only through other entities such as DHS or individuals. Thus we must look at the facts set forth above to determine the import of the court's statement.

**8.** Even though the issue of jurisdiction was not raised before the trial court, we must consider appellant's challenge, as jurisdiction may be questioned at any time by a party or by the court itself. *See Customers Parking, Inc. v. District of Columbia,* 562 A.2d 651, 654 (D.C.1989). The parties cannot confer jurisdiction on the court by consent. *Id.* at 654. In *B.J.P. v. R.W.P.,* 637 A.2d 74, 78 (1994), in the context of a child visitation case, this court distinguished between subject matter jurisdiction generally, which may not be waived, and "subject matter jurisdiction based on territorial considerations," which may be waived. That context differs from the one before us, in which we apply a statute that specifies the particular circumstances in which the Superior Court can issue decrees of adoption.

The conclusion we reach upon examining the records in their entirety is that even though the court did not formally commit A.W.K. to DHS, the pervasive responsibilities regarding A.W.K. that the court placed upon DHS and the manner in which DHS exercised and characterized them, brought about a situation in which DHS was exercising a substantial degree of "legal care, custody, or control" over A.W.K.[9] Under the unusual circumstances present in this case, we hold that the Superior Court had jurisdiction over the adoption proceedings. At the same time, we admonish all who participate in adoption proceedings in the Superior Court that it is incumbent upon them to assure that the court has jurisdiction under D.C.Code § 16–301(b). Failure to do so may cause complications and delay, and may require the adoption proceedings to be begun anew.

### III.

We consider next whether the trial judge acted within his discretion in bifurcating the adoption proceeding by going forward first with a show cause hearing with respect to the birth parents' withholding of consent to adoption in which the focus was almost entirely upon the fitness of the birth parents.[10] In its omnibus pretrial order, the court provided in part:

> That this case is set for trial on September 4, 1997 at 10:00 a.m. to be conducted in two (2) stages, if necessary, the first stage being limited to a full evidentiary hearing under D.C.Code 16–304(e) on the issue of whether the biological parents are withholding their consent contrary to the best interests of the child, and counsel for the petitioner must develop sufficient evidence on the record to show by clear and convincing evidence that they are so withholding their consent, by calling them as adverse witnesses or by other independent evidence as he sees fit, and should the Court so conclude that he has met his burden and waive or dispense with the consent of each parent, that will conclude the matter and the court will decide finalization of the adoption on the paper record in the court file; if the Court denies the request to waive or dispense with their consent at the conclusion of the first stage, the Court will immediately proceed to the trial of all the remaining issues in the adoption case.

At the September 4, 1997, hearing the court refined the omnibus order to clarify that the only issue to be decided would be the fitness of the birth parents. That hearing was converted into a status hear-

---

9. While "legal care, custody, or control" is not defined within the District's adoption statute, the term "legal custody" is defined elsewhere in Title 16 of the D.C.Code, specifically in the section dealing with delinquency, neglect, and need of supervision proceedings. According to D.C.Code § 16–2301(21), "legal custody" includes the following:

(A) physical custody and the determination of where and with whom the minor shall live;

(B) the right and duty to protect, train, and discipline the minor; and

(C) the responsibility to provide the minor with food, shelter, education, and ordinary medical care.

See also Ysla, supra, 684 A.2d at 777–78.

"Care" has been defined as "watchful oversight: charge or supervision"; "control" means "the authority or ability to manage or direct." THE AMERICAN HERITAGE DICTIONARY, 289, 410 (3d ed.1992).

10. We observe that this case is not one in which we are dealing with an infringement upon the right of a birth parent to choose her child's custodian unless he or she is deemed unfit or ineligible to do so. See In re F.N.B., 706 A.2d 28, 31 (D.C.1998).

ing at which counsel for the birth parents urged the court to enter an order requiring the Smiths to supply answers to certain interrogatories which the Smiths had declined to answer. The interrogatories which the Smiths had declined to answer sought extensive information about their family backgrounds and financial histories. Counsel for the birth parents argued that their clients needed to know such information in order to make a decision whether to withhold consent to adoption by the Smiths. The trial judge asked counsel for An.K.:

> Taking your argument to the plausible, logical extreme [,] what you are saying is that in order to establish whether the consent is being withheld contrary to the best interests of the child they are entitled to know the same things they would know in a full-blown adoption trial?

When An.K.'s counsel answered that she believed so, the court raised the question whether that would not make "the statutory provisions about show cause hearings purely superfluous."

The trial judge then turned to assistant corporation counsel and asked whether there was appellate authority with respect to whether the consent issue required an exploration of the content and character of the petitioners, or whether it could be decided solely on the basis of the qualifications of the birth parents and their interrelationships with the child. The assistant corporation counsel responded that he could "say that other trial courts faced with this procedure have in fact gone through 16–304 proceedings as to the fitness of [the] parent only as an initial proceedings [sic] and come to that conclusion before moving on." The assistant corporation counsel then clarified that such hearings dealt only with the fitness of the birth parents. Counsel for the petitioners then responded to the same question by an-swering that "the practice of this court and attorneys ... has been ... to entertain 304 show causes, as a means of adjudicating essentially TPRs [termination of parental rights] in [adoption] cases...." Counsel for the birth parents did not dispute these representations. Counsel for the petitioners emphasized that the hearing would be substantially in the nature of a TPR proceeding.

At the conclusion of the colloquy with counsel, the court agreed that the show cause hearing would be conducted "in the nature of TPR" and stated that the hearing on the consent issue would deal solely with the "issue of the fitness of the parents at this point, and their relationship to the child, so that is the focus of that 304(e) hearing at this point. It does not get into the petitioners." He observed that to agree with the counsel for the birth parents would convert the 304(e) hearing into the equivalent of a full-blown adoption trial. Once the court decided that the hearing should be essentially in the nature of a TPR proceeding, counsel for the birth parents suggested that the Office of Corporation Counsel participate in the proceedings, as only the District or counsel for the child can initiate a TPR. The court agreed and asked the assistant corporation counsel to take part. The court subsequently conducted an evidentiary hearing. At the conclusion of the hearing, the court ruled that the petitioners had established by clear and convincing evidence that the birth parents were withholding their consent contrary to the best interests of A.W.K. See In re P.G., 452 A.2d 1183, 1184–85 (D.C.1982) (petitioner must prove by clear and convincing evidence that consent withheld contrary to child's best interests). Counsel for petitioners, with the cooperation of the assistant corporation counsel, presented evidence showing the unsuitability of the birth parents, much as would be done in a TPR hearing.

An.K. argues essentially that the procedure that was followed did not comport with § 16–304(e), which states "the court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interests of the child." An.K. emphasizes that the statute refers to "a petition for adoption" and that she should have been able to explore whether it was contrary to the best interests of A.W.K. to withhold consent to the particular adoption proposed. In order to do that, An.K. contends, she needed to possess more information about the adoptive parents.

█ We begin by observing that generally the trial court has considerable discretion in determining how it shall proceed in a particular case. *See Lisa v. Fournier Marine Corp.,* 866 F.2d 530, 531 (1st Cir. 1989) (bifurcation of trial to avoid confusion of jury not abuse of discretion); *see also Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284 (1977) (as Super. Ct. Civ. R. 42 is identical to corresponding federal rule, federal cases are authority in interpreting it). As the trial judge pointed out, § 16–304(e) contemplates a hearing devoted to the question of whether consent is being withheld contrary to the child's best interests. Such a hearing is obviously intended by the statute to be something less than a plenary hearing on the adoption.

It is worth noting that at the time of the hearing on September 4, the Superior Court was poised to promulgate its first set of rules of procedure governing adoption proceedings. Those rules were in fact adopted on September 10, 1997, and took effect on October 15, 1997, a few weeks after the evidentiary hearing in this case. They had been published for comment in the Daily Washington Law Reporter on July 21 through July 24, 1997. Even though those rules were not in effect during the trial and did not control its conduct, it must be assumed that they embodied the considered judgment of the Superior Court Board of Judges on the most appropriate way to conduct adoption proceedings at the time. In discussing how to proceed, the trial judge mentioned the pendency of these rules to the parties. Adoption Rule 39(a) deals with hearings to show cause why consent to adoption is not being withheld contrary to the best interests of the child, but does not deal directly with bifurcation of such hearings. Adoption Rule 42(c), however, provides that "the judicial officer, in furtherance of convenience or to avoid prejudice, or when conducive to expedition and economy, may order the trial to be bifurcated as to one or more claims or issues." Rule 42(a) authorizes the consolidation of adoption proceedings with TPR proceedings. These provisions recognize the trial court's broad discretion in determining the manner in which an adoption case will be tried.

In *In re D.R.M.,* 570 A.2d 796 (D.C. 1990), the trial court, in determining whether the birth mother was withholding her consent to the adoption contrary to the best interests of the child, had applied the criteria set forth in D.C.Code § 16–2353(b) governing proceedings for termination of parental rights. *Id.* at 802. This court concluded that even while weighing the factors appropriate to a TPR analysis, the trial judge adequately considered the criteria for adoption set out in D.C.Code § 16–309(b). *Id.* at 803–04. While *D.R.M.* does not deal with the particular issue we face in this case, its holding demonstrates that essentially TPR considerations can be central to the disposition of an adoption proceeding. *See In the Matter of K.A.,* 484 A.2d 992, 998 (D.C.1984); *In re Coast,* 385 Pa.Super. 450, 561 A.2d 762, 766–67 (1989);

*Eder v. West,* 312 Or. 244, 821 P.2d 400, 411 (1991).

There are advantages for the birth parents as well as for the petitioning adoptive parents in a procedure which separates the consideration of the birth parents' fitness from the remainder of the proceedings. A significant advantage for birth parents is that it avoids any tendency to base a decision on the relative merits of the birth parents compared with those of the adoption petitioners. In *In re C.O.W.,* 519 A.2d 711 (D.C.1987), we warned that the outcome of a TPR proceeding could be called into question "if it appeared that all the court had done was to make a direct comparison of the natural parent and the foster home." *Id.* at 714; *see also Handling Child Custody, Abuse and Adoption Cases: Family Law Series* § 14.13 (1987) (desirable to exclude evidence concerning prospective adoptive parents until after the court decides whether grounds exist to waive the requirements of the parents' consent).

Appellant An.K. argues that even if the court's bifurcation was permissible, the court erred in considering some, but not all, of the criteria that D.C.Code § 16–2353(b) directs the court to consider in TPR proceedings. Specifically, An.K. alleges that the court failed to consider "the physical, mental and emotional health of all individuals involved to the degree that such affect the welfare of the child" and "the quality of the interaction and interrelationship of the child with his . . . caretakers," the Smiths.

An.K. is wrong with respect to the second of the two quoted criteria. In its written Findings of Fact, Conclusions of Law and Memorandum Opinion of December 22, 1997, the court made specific findings concerning the nurturing the Smiths had afforded A.W.K. and how "exceptionally well bonded" they were to him.

With respect to the physical, mental, and emotional health of the individuals involved, the court made extensive conclusions concerning the physical, mental, and emotional health of the birth parents, *Id.* at 18, but not of the Smiths. The court's order commented only briefly on appellees' excellent demeanor and the quality of their performance as caretakers, and did not permit counsel for A.W.K.'s since-deceased birth father to ask questions concerning any DHS visits to the Smith's house.

The court's focus was in keeping with the manner in which it bifurcated the proceedings, and was shaped by its concern that to allow any substantial inquiry into the lives and backgrounds of the Smiths would frustrate the purpose of bifurcation and make the show cause hearing the equivalent of a plenary hearing on the adoption petition.

We are persuaded that the court allowed sufficient inquiry and made adequate findings to comply with the essentials of a TPR proceeding as imported into this adoption case. The court's careful and protracted consideration of A.W.K.'s interaction with all persons with whom he had contact, and its searching inquiry into how the birth parents had, or had not, asserted and exercised their parental rights, achieved the purpose of the TPR-type hearing. The relatively minor nature of the exclusion of some aspects of appellees' backgrounds and conduct outside of the interaction with A.W.K. did not unduly limit the hearing. In reaching this conclusion we necessarily adopt the related conclusion that the trial court acted permissibly in considering whether the birth parents were withholding consent contrary to the best interests of A.W.K. without a full consideration of the particular adoption which was being sought. In the circumstances of this case, it was permissible for the court, in its discretion, to

focus almost entirely on the fitness of the birth parents themselves in considering whether to waive their consent.

It follows from the foregoing conclusions that the trial court did not abuse its discretion in holding in abeyance any further discovery by the birth parents into the financial and personal backgrounds of the petitioners for adoption pending resolution of the consent issue.

### IV.

■ With respect to the outcome of the proceeding regarding the withholding of consent, we are persuaded that there was indeed clear and convincing evidence upon which the trial court could base its conclusion that the birth parents were withholding consent contrary to the best interests of A.W.K. As discussed earlier in this opinion, appellant An.K. gave birth to A.W.K. while addicted to cocaine, leaving him to become a boarder baby at D.C. General Hospital. An.K. failed to make any provisions for A.W.K.'s care upon his release from the hospital. While it is tragic that her life has been marred by a series of criminal acts, and reliance on prostitution and boyfriends for financial support, it does not change the reality that the evidence strongly supported the decision that An.K. was unfit to serve as a parent to A.W.K., and that it was contrary to A.W.K.'s best interests to withhold consent to adoption. *See In re D.I.S.*, 494 A.2d 1316, 1323 (D.C.1985) ("Application of the best interests of the child standard 'in a particular case presents one of the heaviest burdens that can be placed on a trial judge.' In reviewing this difficult decision, we will reverse only for abuse of discretion.") (quoting *Coles v. Coles*, 204 A.2d 330, 331 (D.C.1964)).

■ We add with regard to the ultimate granting of the petition for adoption that the suitability of the Smiths to adopt was such that the trial court's granting of the adoption was obviously in the best interest of the child. Although appellant does not raise any issue on appeal with respect to the Smiths' suitability, we think it worth noting that the evidence supported the trial court's conclusion that "they profoundly love [A.W.K.] and are giving him the very best of care, to the same extent as if [A.W.K.] were their biological child. Indeed, they are giving him a far superior quality of care than many biological parents give to their natural children." The court also "concluded that they were very loving, patient, dedicated and caring parents to [A.W.K.] and were exceptionally well bonded to him and he with them." Referring to Mrs. Smith's leaving her New York home and living in Maryland for over nine months to care for A.W.K. before they could take him to New York, the court stated: "This was a super-exceptional commitment and dedication on her part in giving love and devotion to this child." The court examined the personal suitability of the Smiths as well as their actions regarding A.W.K., and came to the conclusion, fully supported by the record before it, that the petition should be granted.

### V.

We note finally that after the adoption court's decision that the birth parents were withholding their consent to adoption contrary to the best interests of A.W.K., a decision which was communicated to the neglect judge, there could be no doubt that the neglect judge acted within her discretion in terminating further visitations between A.W.K. and his incarcerated birth parents at that time. *See In re A.M.*, 589 A.2d 1252, 1257 (D.C.1991) (determination of where best interests of the child lie reversed only for abuse of discretion); *In re J.M.C.*, 741 A.2d 418, 423 (D.C.1999) (same).

For the foregoing reasons the rulings of the Superior Court are affirmed.

*So ordered.*

WAGNER, Chief Judge, dissenting:

In my view, the court lacked jurisdiction of the adoption proceeding. I agree with the majority that the authority of the Superior Court over adoption cases derives from statute and not from the general equitable powers of the court. However, in my opinion, the jurisdictional requirements of the adoption statute were not met in this case. Since the petitioners in the adoption proceeding were not residents of, and did not reside in the District of Columbia for one year preceding the filing of the adoption petition, the only remaining basis for subject matter jurisdiction was if "the child to be adopted [was] in the legal care, custody, or control of the Mayor or a child-placing agency licensed under the laws of the District of Columbia." D.C.Code § 16–301(b) (1997 Repl.).[1] As the District concedes, the court never committed the child to the care, custody or control of the Mayor or city agency authorized to assume that responsibility or a licensed child-placing agency. In the neglect proceeding, the trial court rejected the option of committing the child to the custody of a public agency responsible for neglected children under D.C.Code § 16–2320(a)(3)(A), and instead entered orders placing the child first with a relative, and subsequently in the care of an unrelated custodian pursuant to D.C.Code § 16–2320(a)(3)(C) (1997 Repl.).[2] In numerous orders that followed, the court retained the third-party placement arrangement. The majority finds persuasive appellees' argument that the court's orders requiring DHS to secure evaluations and provide various services on behalf of the child were tantamount to placing the child in the care, custody and control of DHS. That can not be the case because the statute provides for the court to order such services for a child who is adjudicated neglected no matter where the court lodges custody. Specifically, D.C.Code § 16–2320(a)(5) provides that

[t]he [Family] Division shall have authority to (i) order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority. . . .[3]

1. D.C.Code § 16–301(a) & (b) provide in pertinent part that the Superior Court has jurisdiction to hear and determine decrees of adoption when any of the following circumstances exist:
 (1) petitioner is a legal resident of the District of Columbia;
 (2) petitioner has actually resided in the District for at least one year next preceding the filing of the petition; or
 (3) the child to be adopted is in the legal care, custody, or control of the Mayor or a child-placing agency licensed under the laws of the District.

2. D.C.Code § 16–2320(a) provides in pertinent part that upon an adjudication that a child is neglected, the court may order any of the following dispositions:
 (1) Permit the child to remain with his or her parent, guardian, or other custodian, subject to such conditions and limitations as the [Family] Division may prescribe . . .
 (2) Place the child under protective supervision.
 (3) Transfer legal custody to any of the following—
 (A) a public agency responsible for the care of neglected children;
 (B) a child placing agency or other private organization . . . licensed or otherwise authorized by law . . . and designated by the Mayor . . . to receive and provide care for the child; or
 (C) a relative or other individual who is found by the Division to be qualified to receive and care for the child. . . .

3. The court may also order any private agency receiving public funds for services to families or children to provide any such services when the Division deems it in the best inter-

Thus, under this statute, even if the child is allowed to remain in the legal care and custody of the parent, the court can order a public agency to provide services deemed essential to the rehabilitative process and in the best interests of the child. Such services are typically of the type provided in this case, including coordinating and arranging visits with non-custodial, natural parents. Similarly, the court orders for District agencies to prepare reports pursuant to statute are among the services which the court can order no matter where it lodges custody of the child.[4] Therefore, it can not be inferred from the fact that the court orders a public agency to provide such services pursuant to statute that it intends to, or does effect a modification of the legal custody of the child as established by prior court order.

Moreover, the trial court entered numerous orders in this case in which it had an opportunity to alter its custody placement, and it chose not to do so. It is only reasonable to infer that the court did not intend to place the legal care, custody and control of the child with the Mayor or DHS. For these reasons, I am persuaded that the prospective adoptee in this case was not in "the legal care, custody, or control of the Mayor or a child-placing agency licensed under the laws of the District" within the meaning of D.C.Code § 16–301(b)(3). Therefore, the court lacked jurisdiction to hear and determine the adoption petition at the time relevant hereto. *See In re* S.G., 663 A.2d 1215, 1221 (D.C.1995). " 'Parties cannot waive subject matter jurisdiction by their conduct or confer it on the court by consent, and the absence of such jurisdiction can be raised at any time.' " *Customers Parking*

*v. District of Columbia,* 562 A.2d 651, 654 (D.C.1989) (quoting *Laffey v. Northwest Airlines, Inc.,* 185 U.S.App.D.C. 322, 367, 567 F.2d 429, 474 (1976)). Accordingly, whether the parents' consent to adoption was being withheld contrary to the best interests of the child, the issue raised by the court's show cause order, was not properly before the court. The trial court was obliged to dismiss the petition for adoption.

It may seem somewhat anomalous to conclude that the trial court lacked jurisdiction to entertain the adoption petition of non-residents even though it had jurisdiction to adjudicate the prospective adoptee to be a neglected child and supervised the child's care thereafter. However, the case was simply not in a posture where jurisdictional prerequisites for adoption had been met. Had circumstances warranted it, the court could have transferred legal custody of the child to DHS, pursuant to D.C.Code § 2320(a)(3)(B), and the jurisdictional requirements for entertaining the adoption petition of non-residents could have been met subject to the time requirements imposed by law. *See* D.C.Code § 16–301(b)(3). Alternatively, the court may "[t]erminate the parent and child relationship for the purpose of seeking an adoptive placement for the child pursuant to subchapter III [i.e. D.C.Code §§ 16–2351 to –2362]." D.C.Code § 16–2320(a)(6). However, the relevant sections of subchapter III provide that a motion to terminate parental rights must be initiated by the District of Columbia government or by the child, through his or her legal representative. D.C.Code § 16–2354(a) (1997 Repl.). Since that did not occur here, apparently the trial court was not attempting to follow

---

ests of the child and within the scope of the legal obligations of the agency. D.C.Code § 16–2320(a)(5).

4. *See, e.g.,* D.C.Code § 16–2319 (1997 Repl.) (predisposition study and report) and D.C.Code § 16–307 (1997 Repl.) (investigation, report and recommendation of petition for adoption).

the § 16–2320(a)(6) procedure. In addition, except under circumstances not present here, such motions can be filed "only when the child who is the subject of the motion has been adjudicated neglected at least six (6) months prior to the filing of the motion and the child is in the court-ordered custody of a department, agency, institution or person other than the parent...." D.C.Code § 16–2354(b). Not only was there no motion to terminate parental rights filed by the child's legal representative or by the government, but even the adoption petition of the non-resident petitioners was filed prematurely, less than two months after the adjudication of neglect and one month *before* the disposition hearing in the neglect case.

All of these statutory safeguards exist to protect the interests of the child and to provide fundamentally fair procedures to the parents when the state seeks to sever the parent-child relationship. In what may have been a well-intentioned effort to provide the swift integration of the minor child into a permanent adoptive home, multiple requirements of law were not followed, including the jurisdictional requirements for adoption by a non-resident.[5] This court should not establish a precedent which sanctions short circuiting these requirements. For these reasons, I respectfully dissent from the opinion of the court.

---

**5.** Less than two months after the adjudication of neglect, the adoption petition was filed. Although the jurisdictional prerequisites were not met, the trial court issued an order for the natural parents to show cause "as to whether their consent to the adoption is being withheld contrary to the best interest of the child [ ]." The trial court was notified that an investigation of the home of the out-of-state petitioners could not be requested until the parental rights of at least one parent had been terminated or until their consents were

waived by the Court. Subsequently, the trial court determined that the consents for the parents to the adoption should be waived in spite of the fact that it had not received a report on the suitability of petitioners' home for adoptive placement. The trial court granted an interlocutory decree of adoption, which provided that it was "subject to being vacated and set aside completely within one (1) year should the State of New York refuse to approve final adoption placement in this case."