968 A.2d 106 (2009)
In re Petition of J.T.B., T.W., Appellant.
No. 08-FS-557.
District of Columbia Court of Appeals.
Argued December 11, 2008.
Decided March 26, 2009.
*108 Monica Myles, Douglasville, GA, appointed by the court, for appellant.
Anthony R. Davenport, appointed by the court, for appellee.
Catherine Ferrando, Assistant Attorney General, D.C., with whom Peter J. Nickles, Acting Attorney General at the time the brief was filed, and Todd S. Kim, Solicitor General and Donna M. Murasky, Deputy Solicitor General, were on the brief, for the District of Columbia.
Nan R. Hooven, Guardian Ad Litem for M.W., Santa Rosa, CA, joined in the arguments submitted by the District of Columbia in its brief.
Before REID, GLICKMAN, and THOMPSON, Associate Judges.
REID, Associate Judge:
Appellant, T.W., the birth mother of M.W., appeals from an order of the Honorable Linda K. Davis (sitting as a Reviewing Judge in the Family Court) which denied T.W.'s motion and amended motion for review of the Final Decree of Adoption, issued by the Honorable Carol Dalton (Magistrate Judge) in response to appellee, J.T.B.'s petition to adopt M.W. We hold that Super. Ct. Adoption R. 52 requires the Family Court to issue written findings of fact and conclusions of law prior to granting or denying a decree of adoption, even though the court may have made oral findings and conclusions on the record. However, we agree with the Reviewing Judge that the error in failing to adhere strictly to the written findings and conclusion requirement of R. 52 was harmless in this case. Discerning no other error on this record, we affirm the judgment of the Family Court.

FACTUAL SUMMARY
The record shows that since her birth in August 2001, M.W. has lived with T.W. for less than one month. T.W., a victim of abuse by her biological father, and abandonment by her birth mother, grew up initially with relatives and then in foster care. She has had a history of multiple problems, including substance abuse, mental illness, and criminal behavior. T.W. took the child to her maternal aunt's home in early September 2001.[1] On August 13, 2002, due to her difficulties with T.W. with respect to the care of M.W., the aunt took M.W. to the District's Child and Family Services Agency ("CFSA"). The following day, the District formally removed M.W. from her birth mother's care, and placed M.W. with the aunt. At that time, CFSA's goal was reunification of M.W. with her mother.
However, between 2002 and 2007, T.W. displayed erratic behavior and generally failed to cooperate with CFSA in implementing its plans for reunification. Hence, CFSA's goal for M.W. eventually changed from reunification with her mother to adoption. On March 8, 2004, the aunt filed a petition to adopt M.W., but questions arose concerning the aunt's cognitive skills and physical condition. Examinations of the aunt revealed a depressive disorder, arthritis, and headaches. In September 2005, a therapist concluded that the aunt "was overwhelmed in parenting [M.W.], and hence, she was not a viable option for providing long-term care of [M.W.]." Moreover, the aunt had a history of involvement with CFSA in the 1980s and 1990s when she allegedly abused her sons. Consequently, in May 2006, CFSA *109 informed the aunt that it would not support her petition for adoption of M.W. Instead, CFSA began to recruit an adoption parent and focused on J.T.B., who began weekly supervised visitations with M.W. in late September 2006, unsupervised day visits in late October 2006, and unsupervised overnight visits in early November 2006. In late December 2006, CFSA removed M.W. from the aunt's home and placed the child with J.T.B., a divorcee who resided in Maryland.[2]
J.T.B. lodged her petition for adoption of M.W. in late April 2007. Subsequently, CFSA submitted to the Family Court its adoption report and recommendation, dated December 4 and 5, 2007, supporting J.T.B.'s petition. CFSA outlined an extensive history of neglect proceedings involving M.W., T.W.'s history, the aunt's history, and background on J.T.B., including her parents, siblings, work experience, and former marriage.
On January 29, 2007, and October 9, 2007, evidentiary hearings took place before Magistrate Judge Dalton. The January 29, 2007 hearing was styled as a show cause hearing (as to why the consent of the biological parents to the adoption of M.W. should not be waived) and a permanency hearing (adoption). Benita Alvarez, M.W.'s special education teacher responded to questions about M.W.'s educational needs, her classes, the goal of preparing her to enter the regular school population, and her completion of homework assignments under the aunt and under J.T.B. She noted that while she was under the aunt's care, M.W. was "very, very polite and interacted well with adults," but her homework projects were not always completed. She acknowledged that M.W. called the aunt "Momma" and had a "close relationship" with the aunt. Since M.W. has been with J.T.B., all of her homework assignments have been submitted, and she "has been producing better."
Ana Burgos, a social worker and a facilitator with CFSA's Family Team Meeting Unit, was assigned to M.W.'s case from August 2004 to February 2006. Initially, there were few issues with the aunt. Eventually, though, Ms. Burgos "started becoming concerned about [the aunt's] judgment and ability to follow through in meeting M.[W.'s] needs," especially in understanding and helping to meet the child's developmental and speech therapy needs, as well as health requirements such as taking care of M.W.'s dental cavities. She elaborated on her efforts to be supportive of the aunt's desire to adopt M.W. She attempted to persuade the aunt to prepare herself for the adoption by getting her GED, expanding her social network, and finding employment.
Talaya Myers, a CFSA social worker in Adoption Services, took over M.W.'s case from February 2006 to September 15, 2006. When Ms. Myers first began the case assignment, the aunt worked for a cleaning service and sometimes had difficulty arranging day care or after school care for M.W. The aunt did not have "a backup support person," and did not have the resources to buy adequate food, especially when she was unable to go to her cleaning job.[3] Ms. Myers referred the *110 aunt to an adoption support group because she "tend[ed] to be reclusive ... or isolated." She also referred M.W. and the aunt to a center that provided family and individual therapy. Ms. Myers had "no doubt" about the aunt's love for M.W. "[S]he always made sure that [M.W.] was clean and appropriately dressed," and Ms. Myers noted that the aunt kept all of M.W.'s dental and medical appointments. While she supported the aunt's petition for adoption initially, and agreed with others that the aunt "was definitely a good foster parent for M.[W.]," Ms. Myers concurred with others in CFSA that the aunt could not qualify as "an independent adoption parent of M.[W.]." As Ms. Myers indicated, CFSA personnel assigned to M.W. and the aunt finally concluded that they would have had to continue their involvement if the aunt adopted M.W., "and that's not what we look for when we do adoptions."
Counsel for the aunt cross-examined Ms. Myers. She explicitly asked, "what were the reasons why you didn't support the adoption [of M.W. by the aunt]?" Ms. Myers explained:
One of the primary reasons was [the aunt] demonstrated that she had a lack of forethought as far as planning for the future, let's say if something were to happen, there was no backup plan. She never had a support system in place to say, ... if something were to happen to me, this person can take over for M.[W.] and care for her.
And I believe that it was CFSA's position, as well as my position, that we always had to initiate service, say, well, do you see that M.[W.] is struggling maybe with pronouncing some words? Why don't you try this or why don't you try that. We would always have to make a recommendation to try something or to initiate services or identify resources.
[W]e asked her if she knew any community resources in her neighborhood to assist her in time of need. She said she did not. Even with the summer camp, we had to push for her to put M.[W.] into a summer camp for socialization and also to assist her[, the aunt,] to go back to work.
Ms. Myers believed that the aunt could have pursued her GED diploma and vocational training, in an effort to move from the temporary cleaning job that CFSA had arranged for her to another job.
Cedric Jennings, also a CFSA social worker, assumed responsibility for M.W.'s case in September 2006. At that time, "the outstanding issues revolved around [the aunt], her lack of employment, lack of foresight in planning for the child on a permanent basis, financial instability." The aunt became "defensive" and "didn't understand why [there] were concerns." M.W. "seemed to be doing well in school," but her teachers were concerned that she was behind in her book reports. The aunt informed Mr. Jennings that M.W. "was usually resistant in completing the book reports, so she was not able to get her to do her work at home all the time." Mr. Jennings expressed some concern about the condition of the aunt's home, especially the fact that there were only two bedrooms which required M.W. and the aunt to share a bedroom (with the aunt's son occupying the other bedroom), or the aunt would sleep in the living room. After M.W.'s removal from the aunt's home in December 2006, and placement with J.T.B., Mr. Jennings believed M.W. was able to express her feelings more, had caught up with her homework, but had engaged in "tantrums" at the beginning of her placement with J.T.B. because she missed the aunt. At the time of the hearing, the bonding process between M.W. and J.T.B. was evident. Mr. Jennings described *111 the placement of M.W. with J.T.B. as "stable," and "appropriate" because J.T.B. "is able to provide [M.W.] with not just her basic needs, but she's able to plan on a long-term basis for the child...." Moreover, M.W. "has made significant improvements educationally...." On cross-examination, counsel for T.W. established that M.W. still missed the aunt, cried during a January 26 visit with the aunt, and "seem[ed] to have a fantasy that she'll go back to [the aunt]...."
Dr. Jackson Peyton, a psychologist performed a psychological and psycho educational evaluation of the aunt.[4] Testing and observation revealed that the aunt suffered from depression ("depressive disorder, not otherwise specified") and anxiety; "displayed a number of physical symptoms, high blood pressure, obesity, gastrointestinal problems, ... which are correlated with anxiety and depression"; was socially isolated; and lacked a support network. The aunt "scored in the average range of cognitive functioning." Nevertheless, "there was no question in [Dr. Peyton's] mind that [the aunt] was attached to M.[W.] and that she was really concerned about her well being." He "thought that with adequate support, there might be a good chance that things would turn out okay."
M.W.'s guardian ad litem presented the testimony of the aunt who stated that she had been M.W.'s caretaker since a couple of days after her birth. She contacted CFSA when M.W. was eleven-months-old because she did not "feel that [she] could protect [M.W., her great niece] from her [niece, M.W.'s] mother." She described a typical day with M.W., and outings on the weekend (museums, movies, walks, etc.), M.W.'s eating habits, the child's health care and her early fear of "doctors with the white coats," and M.W.'s love of math but her difficulty with book reports. The aunt received $100 a week from her cleaning job and her youngest son, who works five days a week when there is work, pays the cable bill and half the cost of food. When asked about her backup plan for M.W.'s care, the aunt mentioned two people from the Adoption Resource Center and her son. With respect to her therapy sessions, the aunt realized that she had "some issues about things that happened in the past [that she] had buried," but she "realized that [she] had some resentment" and was "angry." She was in the process of working with a therapist, Ms. Marshall, to accept M.W.'s placement with J.T.B. and to work with J.T.B. for M.W.'s sake.[5]
Another hearing occurred on October 9, 2007. Counsel for J.T.B. requested bifurcation of the proceedings, with the first part being devoted to the question of "whether or not the biological parents have withheld their consent to the child's adoption contrary to the child's best interest," and the second part would center on the fitness of J.T.B. as an adoption parent. Counsel for the biological mother, T.W., objected to bifurcation and the Magistrate Judge reserved decision on the matter until the end of the first part of the proceeding.
Mr. Jennings, the CFSA social worker, testified concerning the general lack of contact between M.W. and T.W., the difficulty T.W. had in scheduling visits with M.W., reportedly because of her work schedule. Mr. Jennings never received *112 any money from T.W. for the care of M.W., or any gifts or clothes from her for M.W., and, M.W.'s biological father has had no contact with her. During her cross-examination of Mr. Jennings, counsel for T.W. attempted to show that Mr. Jennings had not provided the proper support to the biological parents. Counsel for J.T.B. objected when Counsel for T.W. asked Mr. Jennings whether M.W. "was living happily" with the aunt when he was first assigned to the case. The Magistrate Judge asked for the relevancy of the question and Counsel for T.W. responded: "It is very relevant as to where the mother wanted the child to be during that time[, a]nd whether or not the mother wanted the child to be with this particular petitioner [J.T.B.]." The Magistrate Judge ruled that: "The relevancy of [the aunt] to these proceedings is not relevant." When Counsel for T.W. protested, the Magistrate Judge inquired whether Counsel was "saying [her] client wanted [the child] with [the aunt] and that's why it's relevant?" Counsel sought to avoid answering the question but when the judge insisted on an answer, Counsel said: "At the time that we're talking about, when [Mr. Jennings] was assigned to the case, yeah, my client did want"; the judge interrupted Counsel, saying: "She did? Oh, did she? Okay. Well, I'm going to find it," at which point Counsel interrupted the judge. After further interruptions, the judge again ruled: "I will find it not relevant and you have a continuing objection for that." When Counsel continued to press the issue and appeared to seek clarification, the judge stated: "The ruling is that ... how the child was doing with [the aunt] is not relevant to the proceedings as to whether I'm waiving or not waiving the parent's interest." Counsel continued to ask Mr. Jennings about the time M.W. lived with the aunt, including the question whether it was correct that the aunt "never neglected [M.W.] ... that required removal during the period of time." The judge then informed Counsel that she, the judge, could take "judicial notice of findings of fact [she] issued in removing the child from [the aunt], which [the birth mother] supported." Counsel's next line of questioning focused on the difficulties M.W. had in being separated from the aunt and placed with J.T.B., resulting in temper tantrums, striking of J.T.B., requests for her return to the aunt, and the need for therapy. Mr. Jennings acknowledged that on one occasion he declined T.W.'s request for a visit with M.W. because the child was "transitioning to a new home."
The hearing appeared to move partially into the phase centering on the fitness of J.T.B. as an adopting parent. J.T.B. testified about her care of and love for M.W., her employment, the neighborhood in which she lived, the beginning "rocky" relationship with M.W. and her tantrums, M.W.'s adjustment, the change in her homework ethic, and M.W.'s decision to call J.T.B. "Mommy." J.T.B. indicated that she had never received any money, cards, gifts, or clothing for M.W. from her biological parents. Although J.T.B. took M.B. to one scheduled visit with her mother, T.W. did not appear. In response to cross-examination questions by Counsel for T.W., J.T.B. acknowledged early difficulties when M.W. was placed with her, including the child's temper tantrums and assertion that she hated J.T.B. She did not oppose T.W. visiting the child, but expressed the view that the therapist should be present because of M.W.'s adjustment difficulties.
The biological parents presented no witnesses. Following closing arguments, and the denial of T.W.'s motion to dismiss, Judge Dalton reviewed the evidence and found that "the parents' conduct demonstrates that neither [M.W.'s biological father *113 nor T.W. is] interested in parenting M.[W.] and [they] haven't taken the necessary steps to develop or maintain a parental relationship"; thus, they abandoned M.W. In addition, they failed to appear for the evidentiary hearings on the waiver of their consent. Hence, after going through four of the statutory factors governing the termination of parental rights, Judge Dalton determined that there was clear and convincing evidence to support the waiver of the biological parents' consent to the adoption of M.W.
Judge Dalton then announced the bifurcation of the fitness part of the proceeding. J.T.B. returned to the witness stand and responded to questions about recent pictures taken of M.W., her employment with the federal Department of Health and Human Services as a program specialist, her home and M.W.'s accommodations, the interaction of M.W. with J.T.B.'s family, and M.W.'s decision, on her own, to call J.T.B. "Mommy."
Vanessa Marshall, a social worker for the Center for Adoption Support and Education, and M.W.'s therapist, held sessions with the child from May 2006 to September 2007; J.T.B. participated in the sessions beginning in December 2006. The sessions ended because Ms. Marshall "decided that M.[W.] has adjusted[,] is doing very well in [J.T.B.'s] home, her community, her school, and [the therapist's] services are no longer needed." Ms. Marshall worked through M.W.'s confusion about her family relationships and her initial behavioral problems when she was placed with J.T.B., manifested fear and anger, and had temper tantrums. Ms. Marshall noted that M.W. had "bonded" with J.T.B., desired to be adopted by J.T.B., and on her own decided to call J.T.B. "Mommy." Ms. Marshall summarized her reasons for recommending that the adoption proceed:
I've watched this very scared little girl blossom and grow, whose self esteem has risen so high it's incredible. Her speech has improved. And all of that definitely is at the credit of J.B.; and her love and her care and her nurturing of this child.
At the conclusion of the fitness hearing, Judge Dalton made oral findings, stating in part, that M.W. "has received continuity of care in J.B.'s home," had not received that continuity from her biological parents, and J.T.B. was "meeting [M.W.'s] physical, mental and emotional needs," M.W. has "quality ... interaction and interrelationship" with J.T.B.'s family, and the "adoption should be granted."
Judge Dalton made additional oral findings on the record on October 9, 2007, after reviewing the testimony. These findings included the continuity of care for M.W. in J.T.B.'s home, but not the biological parents' home, the quality of M.W.'s interaction and interrelationship with J.T.B. and J.T.B.'s family, the improved self-esteem and emotional health of M.W., the fitness of J.T.B. as a parent, and the desire of M.W. to be adopted by J.T.B. In addition, Magistrate Dalton issued the final decree and notice of adoption on December 11, 2007. The mother, T.W., lodged a motion for review of the final decree by an Associate Judge of the Superior Court. She complained that the Magistrate Judge had violated Super. Ct. Adoption R. 52 which provides in pertinent part: "In all adoption cases, the Court shall make written findings of fact and conclusions of law, and grant or deny a decree of adoption." She also claimed error by the judge in not allowing her to cross-examine Mr. Jennings, the social worker, as to why M.W. was removed from the aunt's care in December 2006. Subsequently, Judge Dalton entered written supplemental findings of fact, conclusions *114 of law, and an order waiving consent of the biological mother and father on January 2, 2008.[6] In response, T.W. filed an amended motion for review, (1) asserting that the Magistrate Judge's written supplemental findings and conclusions did not cure the error in issuing the final adoption decree before the filing of written findings and conclusions, (2) reiterating her cross-examination argument, (3) contending that limits placed on the visitation of T.W. with her daughter denied her an opportunity to reunify and bond with M.W., and (4) claiming error in the Magistrate Judge's decision to bifurcate the proceedings.
After reviewing the record, including testimony presented at various hearings, Judge Dalton's oral and written findings and conclusions relating to the aunt's petition for adoption, the waiver of the biological parents' consent, and J.T.B.'s adoption petition, Judge Davis denied T.W.'s motion and amended motion for review on March 25, 2008. Judge Davis noted the Magistrate Judge's extensive oral findings following the October 9, 2007 hearing, at which neither of M.W.'s biological parents appeared, and determined that (1) any prejudice to T.W. from the violation of Super. Ct. Adoption R. 52(a) was cured by the written findings and conclusions; (2) Judge Dalton's decision to limit the cross-examination of Mr. Jennings did not constitute error, that the Magistrate Judge's 25-page order denying the aunt's petition for adoption as not in the best interest of M.W. was not appealed by anyone, including T.W., and the issue as to why M.W. was removed from the aunt's home was "irrelevant to the issues of abandonment and parental fitness [with respect to the biological parents'] withholding their consent to [M.W.'s] adoption [by J.T.B.]"; (3) in light of T.W.'s limited contact with M.W. since the child's birth, her failure to attend the October 9 show cause hearing, and her failure to provide financial support for M.W. or even to give the child gifts, Judge Dalton imposed reasonable conditions on T.W.'s visitation with M.W.; and (4) Super. Ct. Adoption R. 42(c)[7] permits bifurcation, the Magistrate Judge explained the reason for bifurcation, and T.W. provided no authority for rejecting the Magistrate Judge's decision.

ANALYSIS
T.W. essentially repeats the same issues and argumentsconcerning Super. Ct. Adoption R. 52(a), the cross-examination of Mr. Jennings, the bifurcation decision, and the impact of the visitation ruling on her reunification with M.W.that she presented to the reviewing judge in Superior Court's Family Court. Generally, our review of the issues T.W. presents on appeal is governed by an abuse of discretion standard, see In re W.E.T., 793 A.2d 471, 477 (D.C.2002), and "the trial court has considerable discretion in determining how it shall proceed in a particular case." In re A.W.K., 778 A.2d 314, 325 (D.C.2001) (citations omitted). "The trial court can waive otherwise necessary parental consents to a proposed adoption if the court determines [by clear and convincing evidence] that the parents are withholding their consents contrary to the child's best interests[,[8] and] [w]e review *115 such determination for abuse of discretion."[9] "In making its determination, the trial court must weigh the same factors as those weighed in a termination of parental rights proceeding."[10]In re F.W., supra note 9, 870 A.2d at 85 (citing In re J.G. Jr., 831 A.2d 992, 999 (D.C.2003) (other citations omitted)). In reviewing the trial court's adoption order for abuse of discretion, we "determine whether the trial court `exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.'" In re T.W.M., 964 A.2d 595, 601 (D.C.2009) (citing In re T.J., 666 A.2d 1, 10 (D.C.1995) (other citations and internal quotation marks omitted)). "[W]e assess whether the trial court applied the correct standard of proof, and then evaluate whether its decision is supported by substantial reasoning drawn from a firm factual foundation in the record." Id. (citations and internal quotation marks omitted).

*116 The Rule 52 Issue and the Requirement of Written Findings

T.W. contends that the Magistrate Judge erred by issuing the final decree of adoption and notice of issuance of the final decree prior to the filing of written findings. She further alleges that the reviewing judge erred in her determination that the alleged procedural error was harmless. She complains that "[t]he lack of written findings of fact and conclusions of law denied the mother her due process rights and left the mother guessing as to the court's reasoning in this extremely important matter ... which has the effect of terminating the parent's rights." The District argues, in part, that "[w]hile Rule 52 requires written findings, it does not explicitly state that those findings must be issued prior to a final decree of adoption."
Super. Ct. Adoption R. 52 specifies, in relevant part: "In all adoption cases, the Court shall make written findings of fact and conclusions of law, and grant or deny a decree of adoption." The plain words of Rule 52 require written findings and conclusions first, and then the order denying or granting the petition for adoption. Consequently, we hold that Rule 52 requires the Family Court to issue written findings of fact and conclusions of law prior to granting or denying a decree of adoption, even though the court may have made oral findings and conclusions on the record.
Repeatedly, we have stated that "biological parents have a `fundamental liberty interest ... in the care, custody, and management of their child [which] does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [District of Columbia government].'" In re K.I., 735 A.2d 448, 454 (D.C.1999) (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re T.J., supra, 666 A.2d at 11). Given this constitutional due process liberty interest, rules designed to protect the procedural interests of birth parents should be applied as written. The purpose of Rule 52, in part, is to inform biological parents of the reasons why the Family Court proposes to grant the petition of a third party to adopt their child, and to afford the parents an opportunity to seek review and to contest that decision.
Here, the Magistrate Judge did not adhere to the requirement imposed by Rule 52(a). Nevertheless, the Magistrate Judge did comply with the spirit of Rule 52, as the reviewing judge determined, by making extensive oral factual findings on October 9, 2007. Since a biological parent's liberty interest is "not absolute, and must give way before the child's best interest," In re Baby Boy C., 630 A.2d 670, 682 (D.C.1993) (citation and internal quotation marks omitted), we agree with the reviewing judge that the error in failing to adhere strictly to Rule 52(a) was harmless on this record. After receiving the Magistrate Judge's written findings and conclusions, T.W. filed an amended motion for review containing an additional ground for review. Thus, all of her contentions were considered by the reviewing judge, and the procedural error was harmless. See In re W.E.T., supra, 793 A.2d at 476, 478-79 (failure of court or clerk to give notice required by Super. Ct. Adoption R. 52(b) constituted "a basic procedural defect" but trial court reissued final decree of adoption, thus allowing the biological mother to file a timely appeal).

Other Issues Raised By T.W.
T.W. argues that the Magistrate Judge erred in limiting her cross-examination of Mr. Jennings, a CFSA social worker, on October 9, 2007. Counsel for T.W. asked whether M.W. "was living happily" with the aunt when Mr. Jennings assumed *117 responsibility for M.W.'s case. In response to the Magistrate Judge's inquiry about the relevance of the question, Counsel stated: "It is very relevant as to where the mother wanted the child to be during that time[, a]nd whether or not the mother wanted the child to be with this particular petitioner." The judge ruled, "how the child was doing with the aunt is not relevant to the proceeding as whether I'm waiving or not waiving the parent's interest." Arguably, the line of questioning T.W. sought to pose to Mr. Jennings was relevant with respect to one of the Rule 39 show cause factors"[w]hether the birth parent has abandoned the prospective adoptee...." However, Counsel for T.W. never explicitly stated that her line of questioning was designed to show that T.W. had not abandoned M.W., but that the District had removed her from the aunt's care. In addition, to the extent that T.W., through the cross-examination of Mr. Jennings, sought to show that her choice for the care and custody of M.W. was the aunt, the record is devoid of any indication that T.W. wanted the aunt to continue to care for M.W. As Judge Davis declared, "there is absolutely no evidence of record reflecting the mother's choice of anything regarding her daughter." Indeed, the record shows that T.W. did not support the aunt's petition for adoption of M.W., and as Judge Davis observed, T.W. did not take "any action in response to Judge Dalton's decision almost seven months earlier to dismiss [the aunt's] adoption petition." In short, "[t]he extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court," In re L.D.H., 776 A.2d 570, 573 (D.C.2001) (citations and internal quotation marks omitted), and we see no abuse of discretion, and no record evidence to support T.W.'s contention that she was denied her "[c]onstitutional right to `make personal choices in matters of family life'" because of the limitation on the cross-examination of Mr. Jennings.
T.W. complains about the Magistrate Judge's decision to bifurcate the show cause hearing concerning the waiver of the biological parents' consent and the proceeding regarding the fitness of J.T.B. to adopt M.W., asserting that because of her exclusion from the proceeding involving J.T.B.'s fitness, she had no opportunity to cross-examine Ms. Marshall (M.W. and J.T.B.'s) therapist, and was not able to object to the late admission of photographs of M.W. by J.T.B.'s counsel after the formal proceedings had concluded. Super. Ct. Adoption R. 42 allows the trial court to consolidate the adoption proceeding with a proceeding to terminate the biological parents' rights, and further permits the court to bifurcate claims or issues.[11] The record shows that bifurcation did not preclude *118 T.W. from posing questions to J.T.B. Indeed, on cross-examination of J.T.B. on October 9, 2007, T.W.'s counsel was able to establish that when M.W. was placed with in J.T.B.'s home, she had "adjustment difficulties," temper tantrums, asked to leave J.T.B.'s home, said she hated J.T.B. and wanted to remain with the aunt. The reviewing judge determined that the evidence relating to two of the TPR factors, discussed in Judge Dalton's written findings and conclusions, emerged during the time T.W. was excluded from the proceedings, but that the oral findings were sufficient as to the waiver of consent, and T.W., through her amended motion for review, had an opportunity to address the written findings.
Furthermore, in this case, we are satisfied that the bifurcation had no impact on the parents' opportunity to contest the waiver of their consent and the termination of their parental rights. As a practical matter, the first phase of the proceeding, as conducted, operated as a TPR proceeding and the parents had an opportunity to establish that they had not abandoned M.W. and their parental rights should not be terminated. At the conclusion of the first phase, Judge Dalton correctly recognized that the District had presented clear and convincing evidence showing that the biological parents had abandoned M.W. As Judge Dalton stated, in part:
With respect to abandonment it is well established that an adoption will be granted without parental consent on grounds of abandonment only when the parent's conduct manifests an intention to be rid of all parental obligations and to forego all parental rights. Abandonment does not require that a [parent] leave her child at a doorstep, nor does it require that she [ceases] to feel concern for the child.
In determining whether there has been an abandonment a court must consider the totality of the circumstances, including the degree of parental love, care, and attention. In order to show a termination of abandonment the conduct of a parent must demonstrate a desire to care for the child. A mere expression of desire by a delinquent parent will not suffice.
In this case there is no intent to be a parent. There has been no contact on behalf of the mother of any kind except for one visit a while ago, quite a while ago, and one missed visit, and a conversation that work hours did not comport with visiting.
The father has had no visits and there has been no kind of [remun]eration or emotional support from either parent. There is clear and convincing evidence that both parents ... have abandoned and failed to contribute to M.[W.]'s support for six months preceding the date of the filing of the petition for adoption.
[T]he parent's conduct demonstrates that neither [the biological father nor the birth mother is] interested in parenting M.[W.] and haven't taken the necessary steps to develop or maintain a parental relationship.
Judge Dalton also took into consideration the parents' "failure to appear at th[e] show cause hearing despite having been served with formal notice that failure to appear could result in the Court inferring or concluding that both parents ... had abandoned their interest in the child and waived consent." Judge Dalton's findings and conclusions about the parents' abandonment of M.W. are consistent with our case law. See In re C.E.H., 391 A.2d 1370, 1373 (D.C.1978) ("In determining whether there has been an abandonment, a court must consider the totality of circumstances, including the degree of parental *119 love, care and attention"; "an adoption will be granted without parental consent on grounds of abandonment only when the parent's conduct manifests an intention to be rid of all parental obligations[,] and to forego all parental rights.") (citations omitted).
In short, our review of the record convinces us that what we said in In re A.W.K., supra, also a bifurcated proceeding, is applicable here:
We are persuaded that the court allowed sufficient inquiry and made adequate findings to comply with the essentials of a TPR proceeding as imported into this adoption case. The court's careful and protracted consideration of [M.W.'s] interaction with all persons with whom [she] had contact, and its searching inquiry into how the birth parents had, or had not, asserted and exercised their parental rights, achieved the purpose of the TPR-type hearing.... In reaching this conclusion we necessarily adopt the related conclusion that the trial court acted permissibly in considering whether the birth parents were withholding consent contrary to the best interests of [M.W.] without a full consideration of the particular adoption which was being sought. In the circumstances of this case, it was permissible for the court, in its discretion, to focus almost entirely on the fitness of the birth parents themselves in considering whether to waive their consent.
778 A.2d at 326-27. The evidence presented by the special education teacher and the social workers-Ms. Alvarez, Ms. Burgos, Ms. Meyers, Mr. Jennings-as well as J.T.B., and Ms. Marshall, the therapist, amounted to clear and convincing evidence supporting the findings and conclusions of the Family Court concerning both the waiver of the biological parents' consent, and the fitness of J.T.B. as an adopting parent.
Accordingly, for the foregoing reasons, we affirm the judgment of the Family Court.[12]
So ordered.
NOTES
[1] Since the biological mother and her maternal aunt have the same initials, we refer to the aunt as "the aunt" in this opinion.
[2] The aunt had requested an agency fair hearing in October 2006 on CFSA's decision to remove M.W. from her home. That hearing took place on January 4 and 5, 2007, and in late January 2007, CFSA's Hearing Examiner determined that it was not in M.W.'s best interest to be returned to the aunt, and that it was in her best interest to be placed with J.T.B.
[3] Although one of the aunt's adult sons lived with her, apparently he did not work on a regular basis, and did not assist his mother. Ms. Myers applied for grocery vouchers for the aunt.
[4] Dr. Peyton discovered that the aunt suffered traumatic events as a child, including the death of her father when she was a toddler, physical abuse by her stepfather, and rape by four men at the age of 20.
[5] The aunt acknowledged that her two oldest sons had been placed in foster care when they were children, but stated that they were autistic and she "needed help with them."
[6] A written "short order waiving consent" of the biological parents had been docketed on October 9, 2007.
[7] Super. Ct. Adoption R. 42(c) provides:

Bifurcation. The judicial officer, in furtherance of convenience or to avoid prejudice, or when conducive to expedition and economy, may order the trial to be bifurcated as to one or more claims or issues.
[8] After proper notice under Super. Ct. Adoption R. 4 is served on biological parents whose consent to a proposed adoption is being withheld, the Family Division must hold a show cause hearing pursuant to Super. Ct. Adoption R. 39 which provides in pertinent part:

(a) Hearing to Show Cause why consent to the adoption has not been given....
(3) Show Cause Hearing for parent's failure to consent. At a hearing to show cause set pursuant to SCR-Adoption 4 or 39(a) regarding a birth parent who has not consented to the adoption, the Court shall determine:
(A) Whether the putative father fails to admit or deny paternity. If the putative father neither admits nor denies paternity on the record and fails or refuses to take a Court-ordered paternity test, the Court may find his consent unnecessary.
(B) Whether the birth parent or putative parent is willing to consent to the adoption.
(C) Whether the birth parent has abandoned the prospective adoptee and voluntarily failed to contribute to the prospective adoptee's support for a period of at least six months next preceding the date of the filing of the petition for adoption.
[9] In re F.W., 870 A.2d 82, 85 (D.C.2005) (per curiam) (citing In re P.S., 797 A.2d 1219, 1223, 1224 (D.C.2001); D.C.Code § 16-304(a)-(b)(2)(B), (e) (2001); In re D.R.M., 570 A.2d 796, 803-04 (D.C. 1990)).
[10] The termination of parental rights' factors appear in D.C.Code § 16-2353 (2001):

(a) A judge may enter an order for the termination of the parent and child relationship when the judge finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child.
(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
(3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C. Law 2-22; § 4-1301.06(a)). Evidence of continued drug-activity shall be given great weight.
[11] Super. Ct. Adoption R. 42 provides:

(a) Consolidation with termination proceeding. Upon motion and for good cause shown, a judicial officer may order the consolidation of the adoption proceeding with a proceeding to terminate the parental rights of the birth parent of the prospective adoptee. In making the determination, the judicial officer shall consider the best interests of the child, any potential breaches of confidentiality of the adoption proceeding, the additional complexity or judicial economies of a joint proceeding, and any other relevant factor.
(b) Related petitions. When two or more parties have petitioned for the adoption or custody of the same child, the judicial officer may, unless it would result in a breach of the confidentiality of the proceedings, order the petitions to be tried together.
(c) Bifurcation. The judicial officer, in furtherance of convenience or to avoid prejudice, or when conducive to expedition and economy, may order the trial to be bifurcated as to one or more claims or issues.
[12] We are unpersuaded by T.W.'s argument that the Magistrate Judge's order of January 29, 2007, limiting the parental visits to once a month and giving the social worker discretion to limit or suspend the visits, denied T.W. an opportunity to reunify with M.W. and "a realistic opportunity to bond with her child." We agree with the reviewing judge, that under the circumstances of this case, the visitation limits were reasonable.